**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

ALAN ARTHURS,

    Plaintiff,

v.                                                  Case No:  6:14-cv-1209-Orl-40TBS

GLOBAL TPA LLC d/b/a
FREEDOM HEALTH,

    Defendant.
_____

## ORDER

This cause comes before the Court on Defendant's Motion to Dismiss Complaint (Doc. 16), filed September 30, 2014.  On October 17, 2014, Plaintiff responded in opposition (Doc. 19).  Upon consideration the Court denies Defendant's motion to dismiss.

**I.  BACKGROUND**[1]

This False Claims Act dispute arises out of Defendant's termination of Plaintiff's employment in connection with Defendant's alleged violation of certain Medicare marketing regulations.  Defendant, Global TPA LLC d/b/a Freedom Health ("Freedom"), is a private Health Maintenance Organization health plan which contracts with the Medicare Advantage program to provide Medicare Advantage plans to eligible Medicare beneficiaries.  (Doc. 1, ¶¶ 1, 5–6, 8).  Whenever Freedom enrolls an individual in one of

---

1. This account of the facts is taken from Plaintiff's Complaint (Doc. 1), the allegations of which the Court must accept as true in considering Defendant's motion to dismiss. *See Linder v. Portocarrero*, 963 F.2d 332, 334 (11th Cir. 1992); *Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp. S.A.*, 711 F.2d 989, 994 (11th Cir. 1983).

1

its Medicare Advantage plans, Freedom receives between $700 and $1,200 in reimbursement from the federal government through the Centers for Medicare and Medicaid Services ("CMS").[2] (*Id.* ¶¶ 6, 13–17). As a result, strict marketing regulations exist not only to protect the individuals who enroll in plans offered by private entities like Freedom, but also to protect the federal government from fraud. To that end, Freedom requires all of its sales representatives to sign a Sales Representative Commitment to Compliance contract, which mandates "zero tolerance for non-compliance" with these regulations. (*Id.* ¶ 11).

In October 2008, Freedom hired Plaintiff, Alan Arthurs ("Arthurs"), as a Captive Agent and, one month later, promoted Arthurs to Certified Seminar Presenter. (*Id.* ¶ 9). In both positions, Arthurs' primary duty was to sell Freedom's Medicare Advantage plans throughout Central Florida. (*Id.* ¶ 10). During his employment, Arthurs witnessed numerous and pervasive violations of Medicare's marketing regulations. For example, Freedom purchased "age-in" lists that identified individuals who had recently turned or were about to turn sixty-five years old. (*Id.* ¶ 20). Freedom then used these lists to make prohibited, unsolicited contact with those individuals in order to enroll them in Freedom's Medicare Advantage plans. (*Id.* ¶¶ 21–25). Further, Freedom directed its sales representatives to upsell additional services to its current members who Freedom identified through confidential medical records, again in violation of various Medicare marketing regulations. (*Id.* ¶¶ 41–46, 60–62). Freedom also provided marketing

---

2. CMS is a federal agency within the United States Department of Health and Human Services. CMS oversees the federal Medicare program and partners with state governments to administer state-level Medicaid programs. Neither CMS nor the federal government are parties to this lawsuit.

2

materials to its sales representatives which had not received CMS' required approval. (*Id.* ¶¶ 49–52). Finally, Freedom directed its sales representatives to make unsolicited contact to former members of Freedom's plans who had since unenrolled, in further violation of Medicare's marketing regulations. (*Id.* ¶¶ 63–64).

Arthurs complained about these Medicare marketing violations to his direct supervisors on numerous occasions from May 2009 to March 2011, including at morning sales meetings and in private. (*Id.* ¶¶ 26, 29–32, 35–36, 47, 53–54, 65). However, Freedom either rebuked or ignored Arthurs' concerns. (*Id.* ¶¶ 27–28, 33, 37, 48, 66). On one occasion in June 2010, Arthurs requested the name and contact information for Freedom's CMS liaison, but was refused. (*Id.* ¶¶ 38–39). On another occasion, outside counsel for Freedom interviewed Arthurs and other sales representatives. (*Id.* ¶ 55). Although the interview was intended to discuss a matter unrelated to possible Medicare marketing violations, Arthurs took the opportunity to disclose his ongoing concerns. (*Id.* ¶ 56).

In July 2011, Arthurs began to experience back pain and, as a result, was granted medical leave from Freedom. (*Id.* ¶¶ 78–79). While he was on medical leave, Arthurs' supervisor asked him to cover a marketing event at Walgreens. (*Id.* ¶ 80). Arthurs ultimately agreed to manage the event because his supervisor represented that no one else at Freedom was available. (*Id.* ¶¶ 81–85). Arthurs proceeded to the Walgreens location, set up Freedom's table, and spoke with a few customers about Freedom's plans. (*Id.* ¶ 87). However, Arthurs' pain worsened almost immediately. (*Id.* ¶ 88). Nevertheless, Arthurs maintained Freedom's table for fifteen minutes as required by

Medicare's marketing regulations. (*Id.* ¶ 89). After fifteen minutes, though, Arthurs' back pain forced him to take down Freedom's table and leave the event. (*Id.* ¶¶ 89–90).

Afterward, Arthurs' supervisor called Arthurs to admonish him for not attending Freedom's marketing event. (*Id.* ¶ 91). Despite Freedom's employee evaluation policy, the supervisor explained that she had visited the Walgreens location to conduct a surprise performance evaluation of Arthurs, but he was not present. (*Id.* ¶¶ 92, 97–99). Arthurs immediately realized that he had been ambushed by the supervisor and contacted Freedom's Human Resources Department to complain of the supervisor's actions. (*Id.* ¶¶ 100–01). Arthurs additionally emailed another supervisor regarding the conduct and re-iterated his complaints about Freedom's various violations of Medicare marketing regulations. (*Id.* ¶¶ 102–03). Two days later, Freedom fired Arthurs. (*Id.* ¶ 104).

On July 24, 2014, Arthurs initiated this lawsuit by filing a one-count complaint against Freedom for retaliation under the False Claims Act. (Doc. 1, ¶¶ 106–15). Freedom moves to dismiss that claim on the basis that Arthurs fails to state a claim upon which relief can be granted. (Doc. 16).

## II.  STANDARD OF REVIEW

In order to survive a motion to dismiss made pursuant to Rule 12(b)(6), the complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). A claim is plausible on its face when the plaintiff alleges facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Mere legal conclusions or recitation of the elements of a claim are not enough. *Twombly*, 550 U.S. at 555. District courts must accept all well-pleaded factual allegations within the

complaint as true. *Id.* Courts must also view the complaint in the light most favorable to the plaintiff and must resolve any doubts as to the sufficiency of the complaint in the plaintiff's favor. *Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1483 (11th Cir. 1994).

## III.  DISCUSSION

### A.  Statutory Context

The False Claims Act ("FCA"), 31 U.S.C. §§ 3729–3733, has been the federal government's primary tool for combatting fraud perpetrated against it for over 150 years. In addition to providing the federal government with the means to prosecute fraud, the FCA also allows private citizens to initiate *qui tam* lawsuits on the government's behalf, thus increasing the exposure of those who commit fraud. *See* 31 U.S.C. § 3730. Because employees naturally became a primary source of *qui tam* litigation due to their insider status, Congress amended the FCA in 1986 to protect employees who investigate or help investigate potential fraud from the retaliatory acts of their employers. As originally codified, the 1986 anti-retaliation provision stated:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under [the FCA], including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

31 U.S.C. § 3730(h) (2006).

In 2009, Congress amended § 3730 to broaden the protection afforded to those who take action to thwart fraud committed against the federal government. The FCA's anti-retaliation provision now reads as follows:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under [the FCA] or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1) (2012). Importantly, Congress expanded both the category of persons protected by the FCA to include contractors and agents in addition to employees and the category of protected conduct to include non-litigation activities taken to stop a violation of the FCA. *See id.* These changes reflect Congress' intent to "protect all Government funds and property, without qualification or limitation" and to "reverse" the growing trend among courts to construe the FCA's protections narrowly. 155 Cong. Rec. E1295-03 (statement of Rep. Berman), 2009 WL 1544226.

### B. Freedom's Motion to Dismiss

In order to state a claim for FCA retaliation, a plaintiff must establish three elements: (1) he is a protected person, (2) he was engaged in protected conduct, and (3) his employer retaliated against him because of his protected conduct. *See Mack v. Augusta-Richmond Cnty., Ga.*, 148 F. App'x 894, 896–97 (11th Cir. 2005) (per curiam). Freedom challenges the Complaint on the ground that Arthurs has failed to allege sufficient facts showing that he engaged in protected conduct. (Doc. 16, pp. 9–16).

#### 1. Conduct Protected Under § 3730(h)(1)[3]

Prior to the statute's 2009 amendment, courts in the Eleventh Circuit applied the

---

3. Because Arthurs alleges that he engaged in the protected conduct after the FCA's 2009 amendments, the Court applies § 3730(h)(1) as amended. Pub. L. No. 111-21, 123 Stat. 1617, 1625 (2009).

"distinct possibility" standard for analyzing whether conduct is protected by the FCA. Under this standard, an employee engages in protected conduct only where his actions place his employer on notice of a "distinct possibility" of *litigation*, whether through a *qui tam* action brought by the employee or an action initiated directly by the federal government. *United States ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1303–04 (11th Cir. 2010) (per curiam). Arthurs raises the question of whether the "distinct possibility" standard still applies in light of the 2009 amendment to the FCA expanding protection to include conduct "in furtherance of . . . *other efforts* to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h)(1) (2012) (emphasis added). Arthurs' question is well-taken.

In examining the continued applicability of the "distinct possibility" standard to § 3730(h)(1)'s amended language, the maxims of statutory interpretation require the Court to give consequence to every word of the statute, whenever possible, and to read the statute in a manner consistent with its plain language. *TRW Inc. v. Andrews*, 534 U.S. 19, 28–29, 31 (2001); *United States v. Silva*, 443 F.3d 795, 789 (11th Cir. 2006) (per curiam). "If the statute's meaning is plain and unambiguous, there is no need for further inquiry." *United States v. Fisher*, 289 F.3d 1329, 1337–38 (11th Cir. 2002), *cert. denied*, 537 U.S. 1112 (2003). Moreover, when Congress acts to amend a law, it is presumed that Congress intended for the amended language to take effect. *Cf. Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009) (addressing congressional intent in the context of drawing negative inferences from amended statutory language).

As illuminated above, Congress expanded both the category of persons and the category of conduct protected by the FCA. Regarding protected conduct, § 3730(h)(1)

7

can be parsed into two clauses: the litigation clause and the opposition clause. *See* John T. Nicolaou, Note, *Whistle While You Work: How the False Claims Act Amendments Protect Internal Whistleblowers*, 2011 Colum. Bus. L. Rev. 531, 564–65 (2011). The litigation clause protects conduct "in furtherance of an action under [the FCA]." 31 U.S.C. § 3730(h)(1) (2012). On the other hand, by using the disjunctive "or," the opposition clause additionally protects conduct "in furtherance of . . . other efforts to stop 1 or more violations of this subchapter." *Id.* Standing in contrast to § 3730(h)(1)'s litigation clause, the opposition clause's plain language unambiguously contemplates protecting conduct pursued outside the context of potential FCA litigation. This interpretation is further bolstered by the statute's legislative history, which confirms that conduct "such as internal reporting to a supervisor or company compliance department and refusals to participate in the misconduct" are protected under § 3730(h)(1). 155 Cong. Rec. E1295-03 (statement of Rep. Berman), 2009 WL 1544226. Therefore, the Court concludes that the "distinct possibility" standard cannot be used where a protected person alleges opposition clause conduct—conduct that furthers other, non-litigation efforts to stop FCA violations—because there is no possible litigation for an employer to anticipate. Reading the statute otherwise would essentially render the final twelve words of § 3730(h)(1) meaningless, a result Congress surely did not intend.

Although the Eleventh Circuit has not yet addressed the issue, other courts have reached the same conclusion. In *Halasa v. ITT Educational Services, Inc.*, 690 F.3d 844 (7th Cir. 2012), the Seventh Circuit characterized § 3730(h)(1) as protecting two types of conduct: conduct in furtherance of FCA litigation and other conduct, "such as reporting suspected misconduct to internal supervisors." *Id.* at 847–48. In *United States ex rel.*

*Tran v. Computer Sciences Corp.*, No. 11-cv-0852 (KBJ), 2014 WL 2989948 (D.D.C. July 3, 2014), the district court for the District of Columbia similarly recognized Congress' intent to expand protected conduct to include other, non-litigation activities. *Id.* at *21–22; *see also Townsend v. Bayer Corp.*, 774 F.3d 446, 453 n.1 (8th Cir. 2014) (noting the purpose behind broadening the type of conduct protected by § 3730(h)(1)).

The opposition clause is not without bound, however. By the explicit terms of the statute, only conduct which is taken as an "effort to stop" the violation is protected. 31 U.S.C. § 3730(h)(1) (2012). Therefore, a person who acts to oppose an FCA violation for reasons other than protecting the federal government from potential fraud has not engaged in protected conduct. Likewise, a person who quietly refuses to participate in violative behavior with the silent hope that others will take notice is also not protected. *See Tran*, 2014 WL 2989948, at *22. Indeed, the FCA's purpose can only be accomplished by encouraging individuals protected by the statute to "come forward with allegations of fraud perpetrated upon the government." *Roberts v. Accenture, LLP*, 707 F.3d 1011, 1018 (8th Cir. 2013).

### 2.  Arthurs Alleges Protected Conduct Under the Opposition Clause

Freedom contends that Arthurs has failed to allege sufficient facts demonstrating that he engaged in protected conduct. (Doc. 16, pp. 9–16). Freedom submits that the FCA "does not punish every type of fraud committed on the government," only fraudulent claims for payment. (*Id.* at pp. 6–7). Freedom therefore maintains that Arthurs' complaints about Freedom's alleged Medicare marketing violations cannot rise to the level of protected conduct because the alleged violations have nothing to do with

fraudulent claims for payment, but rather consist of mere regulatory transgressions outside the scope of the FCA. (*Id.* at p. 9).

Prior to the FCA's 2009 amendments, regulatory violations could form the basis for FCA liability only where a nexus existed between the violation and a claim for payment. For example, in *McNutt ex rel. United States v. Haleyville Medical Supplies, Inc.*, 423 F.3d 1256 (11th Cir. 2005), the Eleventh Circuit affirmed the district court's finding that the government stated an FCA claim where it alleged that the defendant submitted claims for payment despite its violation of the Anti-Kickback Statute. *Id.* at 1260. The court reasoned that reimbursement under Medicare was contingent on compliance with the Anti-Kickback Statute; therefore, any claim for payment submitted to the government where the Medicare provider failed to comply with the statute necessarily comprised a fraudulent claim. *Id.*; *see also, e.g., Mann v. Olsten Certified Healthcare Corp.*, 49 F. Supp. 2d 1307, 1314 (M.D. Ala. 1999) (finding that allegedly improper billing procedures were sufficiently linked to claims for payment to sustain an FCA action).

In contrast, in *United States ex rel. Clausen v. Laboratory Corporation of America, Inc.*, 290 F.3d 1301 (11th Cir. 2002), *cert. denied*, 537 U.S. 1105 (2003), the Eleventh Circuit affirmed the district court's dismissal of an FCA lawsuit where the plaintiff failed to identify any improper claim for payment that resulted from the defendant's failure to comply with government regulations or internal policies. *Id.* at 1311–12. In so holding, the appellate court emphasized that, although an entity's practices may be "unwise or improper," it is the presentment of a claim for payment to the government flowing from those improper practices, not the entity's regulatory noncompliance, that creates liability under the FCA. *Id.* at 1311; *see also United States ex rel. Howard v. USA Envtl., Inc.*,

No. 8:06-cv-27-T-33MAP, 2009 WL 652433, at *5–6 (M.D. Fla. Mar. 12, 2009) (finding no claim under the FCA because breaches of government contract's health and safety provisions were unrelated to seeking payment from the government), *aff'd*, 363 F. App'x 737 (11th Cir. 2010).

However, with the 2009 amendments also came an expansion of the type of activity proscribed by the FCA. The Congressional Record specifically clarifies that "[s]ubmitting a claim for payment even though the defendant was violating the Government-funded program's conditions of *participation* or payment" constitutes conduct that "clearly violates the False Claims Act." 155 Cong. Rec. E1295-03 (statement of Rep. Berman), 2009 WL 1544226 (emphasis added). Consequently, a regulatory violation may now form the basis of an FCA claim where a connection exists between the violation and an entity's participation in a government-funded program.

Here, Freedom's participation in the Medicare Advantage program is conditioned as a matter of law on its compliance with Medicare's marketing regulations. 42 C.F.R. § 422.510(4)(viii). Over a large portion of his employment with Freedom, Arthurs made numerous complaints about Freedom violating these marketing regulations, including Freedom's use of age-in lists, improper upselling, use of unauthorized marketing materials, and unsolicited contact with beneficiaries. (Doc. 1, ¶¶ 20–25, 41–46, 49–52, 60–64). Arthurs was far from silent about these perceived violations, voicing his concerns to supervisors both openly at morning meetings and privately in person, by email, and by telephone. (*Id.* ¶¶ 26, 29–32, 35–36, 47, 53–54, 65). Arthurs also located Freedom's CMS liaison and informed Freedom's outside counsel of the ongoing prohibited activity. (*Id.* ¶¶ 55–56, 71). Although the Complaint does not mention specific claims for payment

submitted to the Government, the Court can surmise that Freedom submitted at least one claim for payment in the two year period during which Arthurs alleges continuous Medicare marketing violations.  (*Id.* ¶¶ 14, 16) (indicating that Freedom submits claims for payment on a monthly basis).  Therefore, because Freedom's participation in the Medicare Advantage program is conditioned as a matter of law on compliance with Medicare's marketing regulations, the Court can reasonably infer that Arthurs' conduct falls within § 3730(h)(1)'s opposition clause as conduct "in furtherance of . . . other efforts to stop" violations of the FCA.  Accordingly, Freedom's motion to dismiss will be denied.

## IV.     CONCLUSION

For the aforementioned reasons, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant's Motion to Dismiss Complaint (Doc. 16) is **DENIED**.
2. Defendant shall answer Plaintiff's Complaint within **fourteen (14) days** of this Order.
3. Defendant's Motion for Leave to File a Reply in Support of Defendant's Motion to Dismiss (Doc. 20) is **DENIED AS MOOT**.

**DONE AND ORDERED** in Orlando, Florida on March 25, 2015.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record